UNITED STATES v. RIZZINELLI et al.

(District Court, D. Idaho, N. D.   August 24, 1910.)

1. CONSTITUTIONAL LAW (§ 62*)—FOREST RESERVE—REGULATION—RULES—AUTHORITY OF SECRETARY OF AGRICULTURE—STATUTES—CONSTITUTIONALITY.

Act June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1538), conferring on the Secretary of the Interior power, subsequently transferred to the Secretary of Agriculture, to make rules for the regulation and government of forest reserves, subject to specified provisions, was not unconstitutional as attempting to delegate legislative power to an executive officer.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–102; Dec. Dig. § 62.*]

2. MINES AND MINERALS (§ 9*)—LOCATION—FOREST RESERVE—RIGHT TO LOCATE.

Under Act Cong. June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1538), authorizing the location of mining claims within a forest reserve, the rights of a locator of a mining claim on a forest reserve are substantially the same as those conferred by Rev. St. § 2322 (U. S. Comp. St. 1901, p. 1425), on a locator on the public domain.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 9–13; Dec. Dig. § 9.*]

3. MINES AND MINERALS (§ 29*)—LOCATION OF CLAIM—PUBLIC DOMAIN—RIGHT TO LOCATE.

A citizen locating a mining claim on the public domain may acquire one of three possible estates in the land, viz., by locating the claim in compli-

ance with the statutes, rules, and regulations, he may acquire a possessory right, both the equitable and legal title remaining in the United States, or, after making such location, he may comply with further requirements, pay the required purchase price, and acquire the equitable title, the legal title still remaining in the United States, or he may proceed to obtain a patent, thus divesting the government of all interest both legal and equitable.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 66–72; Dec. Dig. § 29.*]

4. WOODS AND FORESTS (§ 8*)—MINING CLAIM—FOREST RESERVE—USE OF SURFACE—ESTABLISHMENT OF SALOON—"EXCLUSIVE ENJOYMENT."

Act Cong. June 4, 1897, c. 2, 30 Stat. 34 (U. S. Comp. St. 1901, p. 1538), conferred on the Secretary of the Interior, afterwards transferred to the Secretary of Agriculture, jurisdiction over the forest reserves, authorized the location of mining claims thereon, and provided that such officer might make rules and regulations for the use of the reserve. The secretary by rule provided that permits should be necessary for all enterprises within the national forests, except, among other things, the prospecting for minerals, etc., and also prohibited the erection or conducting of hotels, stores, power plants, or other structures for manufacturing or business enterprises, except as allowed by law and the forest reserves, and except on patented lands, and on a valid mining claim for the actual development thereof consistent with the purposes for which it was initiated. Rev. St. § 2322 (U. S. Comp. St. 1901, p. 1425), provides that locators of all mining claims, having complied with the laws of the United States and local regulations, shall acquire a possessory title and shall have the "exclusive right of possession and enjoyment" of all the surface included within the lines of their location, etc. Held, that the phrase "exclusive enjoyment," as used in section 2322, means enjoyment of the surface for mining purposes alone, and hence the location of a mining claim within a forest reserve did not operate to withdraw the land embraced therein from the jurisdiction of the Secretary of Agriculture, nor give to locators having acquired a possessory interest only any authority to use the surface for the erection and maintenance of a saloon without a permit from the Secretary of Agriculture.

[Ed. Note.—For other cases, see Woods and Forests, Dec. Dig. § 8.*]

Basil Rizzinelli and another were convicted of maintaining saloons on mining claims within the limits of the Cœur d'Alene National Forest Reserve without a permit. On demurrer to indictment. Overruled.

C. H. Lingenfelter, U. S. Atty., and Wm. M. Aiken, for the United States.

Featherstone & Fox, for defendants.

DIETRICH, District Judge. The defendants are charged with the maintenance of saloons upon mining claims within the limits of the Cœur d'Alene National Forest without a permit, and in violation of the rules and regulations of the Secretary of Agriculture. The claims were duly located, subsequent to the creation of the forest reserve, and they are possessory only, no application for patent ever having been made. The technical sufficiency of the indictment is not called into question, but it is urged: First, that the provision of the statute upon which the rules referred to are founded is unconstitutional, and the rules, therefore, void, because the statute itself does not sufficiently define the acts to be punished, and because it attempts to delegate to an executive officer legislative power; and, second, that, even if the

___

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

statute be held to be valid, it cannot properly be construed as conferring authority upon the Secretary of Agriculture to make rules applicable to the lands embraced in valid mining claims, whether the same were located before or after the creation of the forest reserve.

The Act of June 4, 1897 (chapter 2, 30 Stat. 34 [U. S. Comp. St. 1901, p. 1538]), to which the charge is primarily referred, and the validity of which the defendants attack, provides for the setting apart and maintenance of forest reservations for the purpose of protecting the forests, and securing favorable conditions of water flow, and to furnish a continual supply of timber for the use and necessities of citizens of the United States. It is declared that:

"The Secretary of the Interior shall make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside or which may be hereafter set aside under the said act of March third, eighteen hundred and ninety-one, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this act or such rules and regulations shall be punished as is provided for in the act of June fourth, eighteen hundred and eighty-eight, amending section fifty-three hundred and eighty-eight of the Revised Statutes of the United States."

And it is further provided as follows:

"Nothing herein shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of such reservations, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of the Interior. Nor shall anything herein prohibit any person from entering upon such forest reservations for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof: Provided, that such persons comply with the rules and regulations covering such forest reservations."

And further, as follows:

"Upon the recommendation of the Secretary of the Interior, with the approval of the President, after sixty days' notice thereof, published in two papers of general circulation in the state or territory wherein any forest reservation is situated, and near the said reservation, any public lands embraced within the limits of any forest reservation which, after due examination by personal inspection of a competent person appointed for that purpose by the Secretary of the Interior, shall be found better adapted for mining or for agricultural purposes than for forest usage, may be restored to the public domain. And any mineral lands in any forest reservation which have been, or which may be shown to be such, and subject to entry under the existing mining laws of the United States and the rules and regulations applying thereto, shall continue to be subject to such location and entry, notwithstanding any provisions herein contained."

Subsequently, jurisdiction over forest reserves was transferred to the Secretary of Agriculture, who formulated an elaborate set of regulations, published in what is known as the "Use Book." The particular rules alleged to have been ignored by the defendants (Use Book, pp. 54, 67) are as follows:

"Reg. 6. Permits are necessary for all occupancy, uses, operations or enterprises of any kind within national forests, whether begun before or after the national forest was established, except: (a) Upon patented lands (b) upon

valid claims for purposes necessary to their actual development and consistent with their character; (c) upon rights of way amounting to easements for the purposes named in the grants; (d) prospecting for minerals, transient camping, hunting, fishing, and surveying for lawful projects."

"Reg. 19. The following acts within national forests are hereby forbidden: * * * (c) Erecting or conducting telephone, telegraph, or power lines, hotels, stores, sawmills, power plants, or other structures, or manufacturing or business enterprises, or carrying on any kind of work, except as allowed by law and national forest regulations, and except upon patented lands or upon a valid claim for the actual development of such claim, consistent with the purposes for which it was initiated."

Although, in its general aspect, it is highly interesting and of the deepest concern, the constitutional question should, I think, be disposed of here, without extended discussion. It is one about which the trial courts are at variance. (United States v. Domingo [C. C.] 152 Fed. 566; United States v. Deguirro [D. C.] 152 Fed. 568; United States v. Bale [D. C.] 156 Fed. 687; United States v. Matthews [D. C.] 146 Fed. 306; United States v. Grimaud [D. C.] 170 Fed. 205), and upon which, when recently presented, the court of last resort was equally divided (United States v. Grimaud, 216 U. S. 614, 30 Sup. Ct. 576, 54 L. Ed. ——). The Circuit Court of Appeals of this circuit has unequivocally held the provision valid in its relation to civil rights. Shannon v. United States, 160 Fed. 870, 88 C. C. A. 52. And while it is true that sometimes an administrative regulation may be given effect in the prosecution of a civil suit, and at the same time be rejected as a definition of a criminal offense, the principle of such distinction is, in the present case, not readily discernible. However that may be, in view of the existing diversity of judicial decision, and having respect for the familiar rule that all intendments are in favor of the validity of an act, and that it should not be adjudged to be unconstitutional unless its repugnance to the Constitution clearly appears (Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525), I am of the opinion that, under the principle of stare decisis, the question should be deemed to be ruled by United States v. Domingo, supra, decided by this court (Judge Beatty presiding) in March, 1907, adversely to the contention of the defendants. It is highly important to the orderly administration of justice that in the same jurisdiction there be uniformity of decision; well-considered precedents should be cast aside only for the most cogent reasons. The general rule which forbids judges sitting in the same court from ignoring, for light reasons, the decisions of each other, does not have its origin merely in motives of personal courtesy, but, as experience amply proves, rests upon considerations of a wise public policy. Any other course would tend to unseemly struggle in the courts, and would ultimately result in a weakening of public confidence in the soundness and finality of judicial decisions. Reynolds v. Iron Silver Mining Co. (C. C.) 33 Fed. 354; Shreve v. Cheesman, 69 Fed. 785, 16 C. C. A. 413; Taylor v. Decatur, M. & L. C. O. (C. C.) 112 Fed. 449; Plattner Implement Co. v. International Harvester Co., 133 Fed. 376, 66 C. C. A. 438. While, in these cases, rules of property and of practice are especially referred to, the reasons here presented for uniformity of decision are equally, if not more, persuasive. True, there is directly involved only a comparatively unimportant right or priv-

ilege; but to yield to the defendants' contention is not only to render nugatory the expressed will of the legislative department relative to government policies of general application and of great interest, but also to withdraw from the executive department sanctions deemed to be important in the enforcement of regulations formulated for the protection and conservation of the public forests, however reasonable and necessary the same may be. Upon the whole, I think it is clear that, whatever conclusion I might reach upon a mature and independent consideration, the question should here be regarded as ruled by the Domingo Case, and, this being true, in view of the able discussions already to be found in the published decisions from the lower courts, and of the division of opinion in the Supreme Court, an elaborate consideration of the general question, as if it were of first impression in this jurisdiction, if not presumptious, could, I am sure, be of no substantial service, and I therefore pass to the other branch of the case.

Concretely stated, the second question is whether or not, assuming that the maintenance of a saloon upon public lands within a national forest to which no previous claim of any kind has attached constitutes a criminal offense, a like offense is committed when such a saloon is maintained upon forest reserve lands, embraced within a valid mining claim, located after the creation of the reserve.

By referring to the extracts above quoted from the statute, it will be noted that the authority conferred upon the secretary to make rules is confined to the purpose of regulating the occupancy and use of, and the preservation of the forests upon, the reservations. Congress contemplated that settlers within the boundaries of the reservations should have the right of egress and ingress, and should be permitted to construct and maintain such roads and other improvements as are reasonably necessary for such purpose, and it was further contemplated that persons should, subject to the reasonable rules and regulations of the secretary, have the right to go upon the reserve for all proper and lawful purposes, including that of "prospecting, locating, and developing the mineral resources thereof." In the last paragraph above quoted, which is the next to the last paragraph of the act so far as it pertains to the subject of forest reserves, provision is made for the restoration to the public domain of any lands embraced within the limits of a reservation, which after due examination shall be found better adapted for mining or agricultural purposes than for forest usage. This provision doubtless has reference to the express declaration, found in an earlier paragraph of the act, that it was not the purpose or intention of Congress to "authorize the inclusion of lands more valuable for the mineral therein, or for agricultural purposes than for forest purposes," and imposes upon the executive the duty to make such restoration where the prescribed conditions are shown to exist. The succeeding paragraph seems to confer unlimited authority upon the President by executive order arbitrarily to modify the area, or change the boundary lines of any reserve, or to entirely vacate the order creating it. The only express reference in the act to the location of mining claims is found in the last sentence of the second paragraph above quoted, which in full is:

"Nor shall anything herein prohibit any person from entering upon such forest reservations for all proper and lawful purposes, including that of prospecting, locating and developing the mineral resources thereof: Provided, that such persons comply with the rules and regulations covering such forest reservations."

And the last sentence of the last paragraph above quoted, namely:

"And any mineral lands in any forest reservation which have been, or which may be shown to be such, and subject to entry under the existing mining laws of the United States and the rules and regulations applying thereto, shall continue to be subject to such location and entry, notwithstanding any provisions herein contained."

It is the contention of defendants that the valid location of a mining claim ipso facto withdraws the land embraced therein from the jurisdiction of the Secretary of Agriculture, and that therefore the rules under consideration are wholly inapplicable. Upon the other hand, the government points to the fact that while qualified persons are authorized to locate claims upon lands containing valuable mineral deposits, within as well as without the boundaries of a reservation, there is no language in the act justifying the conclusion that by the location of a mining claim the lands embraced therein are withdrawn from the reservation, and much significance is attached to the clause which provides that the right to go upon reservations for "all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources," is expressly conditioned upon a compliance with the rules and regulations covering forest reservations.

For a definition of the rights of the locator upon public lands, both parties refer to section 2322 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1425), where it is declared that:

"The claimant shall have the exclusive right of possession, and enjoyment of all the surface (of the claim), and of all veins, lodes, and ledges; throughout their entire depth, the top or apex of which lies inside of such surface lines, extended downward vertically," etc.

It is conceded by the government that by the forest reserve act of June 4, 1897, Congress did not intend to, and did not, limit or qualify the rights of a locator, or confer any authority upon the Secretary of Agriculture, by regulation or otherwise, to limit or qualify such rights, or to intrude upon the exclusive possession or infringe upon the exclusive "enjoyment" guaranteed to the locator under section 2322; in short, that the rights of a locator of a mining claim within the boundaries of a forest reserve are substantially the same as those of one who locates such a claim upon the public domain. It is also conceded that the right of exclusive possession runs against the government, as well as against third persons. Obviously, therefore, the controversy is primarily confined to a consideration of the purpose to which the locator may ordinarily and under general law properly devote the surface possession of his mining claim; the defendants contending that they may use the same "for any purpose, whether the same be consistent with mining or not," and, upon the other hand, the government asserting that a locator is, under section 2322, au-

thorized to use the surface of his mining claim only for purposes connected with or incident to the exploration and recovery of the mineral therein contained.

It is familiar law that the citizen may acquire any one of three possible estates in mineral lands upon the public domain. He may content himself with locating a claim in compliance with the statutes and rules and regulations, in which case he acquires a possessory title only, both the equitable and legal title remaining in the United States; or, in the second place, after making such location, he may comply with the further requirements of the law, and pay the required purchase price, thus acquiring the equitable title, the legal title still remaining in the United States; or he may proceed one step further, and obtain patent, thus divesting the government of all interest, both legal and equitable.

The defendants here have the possessory title only. They have a distinct but qualified property right, and, even if we assume that their interest is vested, it is one which may be abandoned at any moment, or forfeited. The primary title, the paramount ownership, is in the government, and upon abandonment by the locator, or his failure to comply with the conditions upon which his continuing right of possession depends, the entire estate reverts to the government; all the time, it retains the title, with a valuable residuary and reversionary interest. This interest, whatever it may be, it has the right to protect and obviously the interest which it retains is the entire estate, less that which is granted by the terms of section 2322, providing that locators shall have "the exclusive right of possession and enjoyment of all the surface of their locations." The true meaning of this granting clause it is therefore of fundamental importance to determine, for by its terms, properly interpreted, the estate of the defendants in the lands which they occupy is to be measured, and, in the absence of any express declaration in the act of June 4, 1897, upon the nature and extent of this estate largely depends the question whether or not there is such incompatibility between the character of a mining claim, and the status of lands in a forest reserve, that the valid location of the former operates to withdraw the lands embraced therein from the latter. The inquiry is substantially limited to the meaning of the phrase "exclusive enjoyment," for, notwithstanding the existence of the Cœur d'Alene forest reserve, it is conceded that the defendants are entitled to the exclusive possession of their claim not only as against third persons, but as against the United States. The government is not seeking to qualify or limit the possession of the defendants or in any respect to intrude thereon, but only to restrict the uses to which such possession shall be devoted. The defendants have a right to the exclusive enjoyment of the surface of their claims, and our task is to determine what is meant by the word "enjoyment" as the name is used in the statute. It is not self-explanatory, or unequivocal, and must be interpreted in the light of the general purpose of the law in which it is found, and in harmony with other provisions thereof. Consciously or unconsciously we necessarily read something into the statute which is not therein expressed. We may differ as to what should be interpolated, but

that there must be some interpolation may not be doubted. The government inserts, after the word "enjoyment," the phrase "for mining purposes," and the defendants the phrase "for all purposes." No other language is suggested, and, indeed, no middle ground appears to be possible; the "enjoyment" is either for mining purposes alone, or for all purposes without qualification or restriction. Under a familiar rule of statutory construction, the necessity of reading into the statute one or the other of these two phrases to make it complete, and its adaptability to either of them, of itself operates strongly to determine the question in favor of the government, for it is well settled that in public grants nothing passes except that which is clearly and specifically granted, and all doubts are to be resolved in favor of the government. Oregon R. & N. Co. v. Oregonian Ry. Co., 130 U. S. 1, 9 Sup. Ct. 409, 32 L. Ed. 837; Coosaw M. Co. v. South Carolina, 144 U. S. 550, 12 Sup. Ct. 689, 36 L. Ed. 537. But, independent of this rule, considerations pertinent to the construction of private grants and contracts clearly lead to the conclusion that the right of enjoyment which Congress intended to grant extends only to mining uses. The general purpose of the mineral laws is well understood; it was to encourage citizens to assume the hazards of searching for and extracting the valuable minerals deposited in our public lands. In form the grant is a mere gratuity; but, in considering the propriety of such legislation, it may well have been thought that by reason of the stimulus thus given to the production of mineral wealth, and rendering the same available for commerce and the arts, the public would indirectly receive a consideration commensurate with the value of the grant. In that view doubtless the legislation has for a generation been generally approved as embodying a wise public policy. But under what theory should the public gratuitously bestow upon the individual the right to devote mineral lands any more than any other public lands to valuable uses having no relation to mining, and for what reason should we read into the statute such a surprising and unexpressed legislative intent?

With much earnestness the consideration is urged that it has become more or less customary to erect valuable buildings upon lands embraced in mineral claims to be used for purposes having no necessary relation to mining operations, and that great hardship would ensue and important property rights would be confiscated if the locator's "enjoyment" of the surface be limited to uses incident to mining. But even if it be true, as suggested, that in many localities sites for dwelling houses and business structures could not be conveniently obtained except upon lands containing valuable mineral deposits and embraced in located claims, the fact is without significance and lends no support to the defendants' contention. If we assume that Congress was cognizant of or anticipated such conditions, we may further reasonably assume that it was thought that ample protection against embarrassment to the mining industry from such a source was furnished in other provisions of the law. At the same time the government confers upon the locator the right to possess and enjoy the surface of a mining claim for mining purposes without the payment of any consideration therefor, it offers for a small considera-

tion to convey to him the entire estate. The government gives the mineral to him who finds it, and, for purposes incident to the ex-traction thereof, permits him to possess and use the ground in which it is found. It does not give him the ground, but empowers him to purchase it, and that he may do if he desires its permanent and un-restricted use. The unqualified title to the land embraced in a valid possessory claim thus being made available to the locator for the moderate prices prescribed by law, there is no force to the argument implied in this contention. Nor is there any merit in the suggestion that the custom of so using the surface of unpatented claims with-out objection from the government is so prevalent as to imply as-sent or acquiescence on the part of Congress in its unrestricted use. In the absence of material waste, it would not be strange if, as a general rule, officers of the government should ignore the occupancy of such lands for purposes beyond those authorized by law, so long as it is without substantial injury. But such inaction serves neither to shed light upon the original legislative intent, nor to confer on the occupant the legal right to continue such occupancy over the objec-tion of the government.

The rights of a locator of a mining claim, and the nature of his estate therein, have not infrequently been considered by the Supreme Court of the United States. That the discovery of valuable mineral and the proper location of his claim operate to vest in the locator a substantial interest may not be doubted. The interest thus acquired is a valuable property right which may be mortgaged, transferred, inherited, and taxed; the right of possession is good against all the world including the United States. Gwillim v. Donnellan, 115 U. S. 45, 5 Sup. Ct. 1110, 29 L. Ed. 348; Manuel v. Wulff, 152 U. S. 505, 14 Sup. Ct. 651, 38 L. Ed. 532; Belk v. Meagher, 104 U. S. 279, 26 L. Ed. 735; Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313; St. Louis Mining Co. v. Montana Mining Co., 171 U. S. 650, 19 Sup. Ct. 61, 43 L. Ed. 320; Elder v. Wood, 208 U. S. 226, 28 Sup. Ct. 263, 52 L. Ed. 464. In some of these cases, and in others, meager expressions may be found incidentally touching upon the question here in controversy; but in none of them, so far as I am aware, was it either involved or discussed. And indeed there has come under my observation no reported case from any court in which the point may be said to have been decided, except possibly Teller v. United States, 113 Fed. 273, 51 C. C. A. 230, where, in a well-considered opinion, the Circuit Court of Appeals of the Eighth Circuit reached a conclusion which it is thought strongly supports the present conten-tion of the government. Speaking of the rights conferred by that part of the statute which we have been considering, the court says:

"It gave him (the locator) nothing but the right of present and exclusive possession for the purpose of mining. It did not devest the legal title of the United States, or impair its right to protect the land and its product, by either civil or criminal proceedings from trespass or waste. * * * The two titles recognized by the United States confer totally different rights. The first one confers a right (and it may properly enough be said to be vested in the lo-cator) to the possession of the land for the purpose of carrying on his mining operations as long as he performs the required conditions."

Holding, therefore, that the right of a locator of a mining claim to the "enjoyment" of the surface thereof is limited to uses incident to mining operations, no serious difficulty is encountered in reaching the further conclusion that forest reserve lands embraced in a mining claim continue to constitute a part of the reserve, notwithstanding the mineral location, subject, of course, to all the legal rights and privileges of the locator. The paramount ownership being in the government, and it also having a reversionary interest in the possessory right of the locator, clearly it has a valuable estate which it is entitled to protect against waste and unlawful use. It is scarcely necessary to say that it is the substantial property right of the government, and not the extent to which such right may be infringed in the present case, that challenges our consideration. The burden imposed upon the principal estate by the construction and maintenance of a little saloon building may be trivial, and the damage wholly unappreciable. But that is not to the point. If a worthless shrub may as a matter of legal right be destroyed in the location of a saloon, the entire claim may be stripped of its timber, however valuable, to give place for other saloons and other structures having no connection with the operation of the mine. To concede any such right at all is necessarily to concede a right without limit; there is no middle ground. It is therefore repeated that, subject to the locator's legitimate use for mining purposes, the government continues to be the owner of the land, and is interested in conserving its value and preventing injury and waste. That being true, in the absence of express language evincing an intent on the part of Congress to withdraw such lands from the jurisdiction of the forestry service, there is no reason to infer any such intent. Upon the other hand, it is much more reasonable to assume that Congress advisedly concluded to leave the government's interest therein subject to the jurisdiction and under the protection of the department that is responsible for the care and protection of the surrounding lands and forests. The locator's rights are not curtailed; there is no intrusion upon his possession; his right of "enjoyment" is not necessarily qualified or infringed by the retention in the forest reserve. He may possess and utilize the entire claim, including the surface, for all the purposes and to the same extent for and to which he could have possessed and used it if no forest reserve existed. To hold that the defendants are indictable for maintaining a saloon upon their mining claim in the reserve is not to hold that their rights as locators are less because the lands are in the reservation than they would be if the claims were upon the open public domain. In neither case does the location of the claim confer the right to maintain a saloon thereon. The only difference is that a remedy is provided in the one case which does not exist in the other. In both cases the government has a remedy by way of civil action; upon the forest reserve, assuming the law to be valid, it has the additional remedy of a criminal prosecution, of which it is here availing itself.

In reaching this conclusion I have not thought it necessary to consider the precise meaning and application of that portion of the act of June 4, 1897, which recognizes the right of persons to enter upon

the forest reservations "for all proper and lawful purposes including that of prospecting, locating, and developing the mineral resources thereof; provided, that such persons comply with the rules and regulations covering the said forest reservations." At the oral argument there was some suggestion by counsel for the government that in this language is to be found authority for the Secretary to make rules regulating mining operations carried on upon valid, located mining claims. The point, however, does not here call for any expression of opinion, for it is not presently involved. The defendants are not charged with the violation of such a rule, and so far as I am advised no such regulations have been promulgated. The charge against the defendants is not of carrying on mining operations without a permit, but of transacting other business having no relation to such operations.

For the reasons stated, the demurrer will be overruled.