168 F.3d 367
 29 Envtl. L. Rep. 20,648, 99 Cal. Daily Op.
Serv. 1159,
1999 Daily Journal D.A.R. 1429
 THE WILDERNESS SOCIETY, and Great Bear Foundation,
non-profit corporations, Plaintiffs-Appellants,
v.
Michael DOMBECK, in his official capacity as Chief, United
States Forest Service; David F. Jolly, in his official
capacity as Regional Forester, Northern Region; Robert L.
Schrenk, in his official capacity as Supervisor, Kootenai
National Forest; United States Forest Service, an agency of
the United States; and Noranda Minerals Corp., a Delaware
Corporation and wholly-owned subsidiary of Noranda, Inc., a
Canadian corporation, Defendants-Appellees.
 No. 97-35954.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 5, 1999.
Decided Feb. 16, 1999.
 
 Todd D. True, Earthjustice Legal Defense Fund, Seattle, Washington, for the plaintiffs-appellants.
 
 
 1
 Andrew C. Mergen, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., for defendants-appellees Michael Dombeck, David F. Jolly, Robert L. Schrenk, and United States Forest Service.
 
 
 2
 David A. Bailey, Parcel, Mauro & Spaanstra, Denver, Colorado, for defendant-appellee Noranda Minerals Corp.
 
 
 3
 Appeal from the United States District Court for the District of Montana; Charles C. Lovell, District Judge, Presiding. D.C. No. CV-91-00078-CCL.
 
 
 4
 Before: CANBY, and GRABER, Circuit Judges, and GEORGE, District Judge.*
 
 GEORGE, District Judge:
 
 5
 This case involves a challenge to the validity of two Noranda Minerals Corp. ("Noranda") mining claims in the Montanore Deposit situated within the Cabinet Mountains Wilderness Area in northwestern Montana. The Wilderness Area is within the Kaniksu National Forest, but is administered by the Cabinet Ranger District of the Kootenai National Forest. In 1971, Pacific Coast Mines, Inc., Noranda's predecessor-in-interest and a wholly owned subsidiary of the United States Borax and Chemical Corporation ("Borax"), began exploring for silver and copper in the Revett Formation, a geologic formation which extends across a vast portion of northwest Montana and eastern Idaho.
 
 
 6
 In October 1982, Borax located its initial Hayes Ridge ("HR") lode claims several thousand feet to the northwest of Rock Lake. In July 1983, Borax discovered a mineralized outcrop of the Montanore Deposit adjacent to Rock Lake. It staked claims from Rock Lake to a point several thousand feet to the northwest (joining up with the original HR claim block). On August 1, 1983, Borax located the original HR 73 and 74 lode claims in the vicinity of Rock Lake. On September 24, 1983, Borax located HRs 133 and 134, which partially overlapped HRs 73 and 74.
 
 
 7
 Borax applied to conduct a pre-withdrawal exploratory drilling program on the Montanore deposit, but the Forest Service denied the request because environmental review procedures could not be completed in time. Ultimately, the Forest Service allowed Borax to complete four drill holes. Two exploratory holes (HRs 2 and 3) drilled about 700 feet to the northwest of the outcrop, but within claim boundaries, showed ore-grade mineralization; two other drill holes (HRs 1 and 4), drilled at approximately 15,500 and 22,000 feet to the northwest of the outcrop, did not reveal ore-grade mineralization.
 
 
 8
 In a report (known as a "valid existing rights" determination) dated February 27, 1985, the Forest Service determined that four of Borax's mining claims, HRs 73, 74, 133, and 134, contained valid existing rights. In January 1988, Borax filed with the Bureau of Land Management ("BLM") a notice of abandonment of HRs 73 and 74. On August 2, 1991, Noranda filed an application for a mineral patent for claims HR 133 and 134 with the BLM. The Wilderness Society and the Great Bear Foundation (collectively "TWS") filed a patent protest challenging the validity of Noranda's mining claims. The BLM requested the Forest Service to provide a report on whether the patent should issue. On June 23, 1993, the Forest Service issued its report, concluding that Noranda had valid mining rights on HRs 133 and 134.
 
 
 9
 On May 24, 1991, TWS filed the instant action against Noranda and the Forest Service. TWS originally challenged the 1985 Forest Service determination that claims HR 133 and 134 were valid. While the action was pending, the Forest Service proceeded to review and to approve Noranda's patent application for the special use permits necessary to develop the claims. TWS filed administrative appeals of these permit decisions. The appeals were denied On August 24, 1994. Thereafter, TWS amended its complaint to assert that the Forest Service violated the Wilderness Act, 16 U.S.C. §§ 1131 et seq., in (1) determining that Noranda's mining claims were validly located under state law, (2) failing to recognize that Noranda's extralateral mineral rights were extinguished by the December 31, 1983, withdrawal of wilderness areas from mineral exploration, (3) relying on drilling data obtained after the withdrawal date to determine that Noranda had valid existing mineral rights, and (4) failing to properly analyze whether Noranda's mining claims contained a valuable mineral deposit.
 
 
 10
 On August 13, 1997, the district court issued a consolidated opinion, order, and judgment denying TWS's motions for summary judgment, excluding the declarations of TWS's expert, Dr. W. Goerold, and granting summary judgment to the government and Noranda on all claims. On October 8, 1997, TWS filed its notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 11
 I. The Validity of Noranda's Mining Claims Under Montana Law
 
 
 12
 State mining law controls procedures for locating mining claims to the extent that it is not inconsistent with federal law. See Butte City Water Co. v. Baker, 196 U.S. 119, 126, 25 S.Ct. 211, 49 L.Ed. 409 (1905). The district court upheld the Forest Service's determination that Noranda's mining claims were validly located under state law. We review questions of statutory interpretation de novo, but will defer to the agency's interpretation of statutes that it administers unless it contravenes the express language of the statute or clear congressional intent. Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). TWS disputes whether the Forest Service's determination of the validity of the subject claims under Montana mining law should be given deference in this case. We need not resolve this dispute, however, because the Forest Service's and the district court's analyses are consistent with a de novo interpretation of Montana law.
 
 
 13
 Borax located HRs 133 and 134 over portions of its HRs 73 and 74 claims. TWS argues that HRs 133 and 134 are invalid because they fail to qualify as relocations of senior claims under Montana law. The parties agree that a claim whose discovery point is within the boundaries of a prior claim constitutes a relocation.[1] TWS argues, however, that the relocation of a mining claim is not entitled to the protections of Montana mining law, unless the prior overlapping location is replaced, abandoned or automatically extinguished at the time of relocation. The district court concluded that "there is nothing in Montana law or federal law that required Borax to abandon its previous claims at the time of relocation, and Plaintiffs have provided no authority that demonstrates otherwise." We agree.
 
 Mont.Code Ann. § 82-2-109 provides:
 
 14
 Amendment or relocation not a waiver of acquired rights. Where a locator or claimant amends or relocates his own claim, such amendment or relocation shall not be construed as a waiver of any right or title acquired by him by virtue of the previous location or record thereof, except as to such portions of the previous location as may be omitted from the boundaries of the claim as amended or relocated. As to the portion of ground included both in the original location and the location as amended or relocated, he may rely either upon the original location or the location as amended or relocated or upon both; provided that nothing herein contained shall be construed as permitting the locator or claimant to hold a tract which does not include a valid discovery.
 
 
 15
 (Emphasis added.)
 
 
 16
 TWS reads the last phrase of the first sentence of § 82-2-109 as establishing that, upon relocation, the original claim is replaced and lost. Because Borax retained the original claims until it abandoned them in 1988, TWS argues that the relocation was void. A plain reading of the statute, however, does not support TWS's interpretation. The last phrase of the first sentence of § 82-2-109 simply provides that the boundaries of a senior claim are deemed contracted upon the relocation so as to exclude ground outside the boundaries of the junior claim. The succeeding sentence in § 82-2-109 speaks to what may be relied on in sustaining the area of overlap of the original and relocated claims: "As to the portion of ground included both in the original location and the location as amended or replaced, [the locator] may rely either upon the original location or the location as amended or relocated or upon both...."[2]
 
 
 17
 While nothing in § 82-2-109 predicates the relocation of a claim on the abandonment of the original claim, TWS maintains that a reading of § 82-2-109 in conjunction with § 82-2-108 leads to that result. Section 82-2-108 provides:
 
 
 18
 Relocation by owner. A locator or claimant may at any time relocate his own claim for any purpose, except to avoid the performance of annual labor thereon, and, by such relocation, may change the boundaries of his claim or the point of discovery, or both, but such relocation must comply in all respects with the requirements of this law as to an original location.
 
 
 19
 According to TWS, the requirement of § 82-2-108--that a relocation must comply in all respects with the requirements of this law as to an original location--dictates that the discovery point of the relocation must be on unappropriated ground. TWS argues that because the discovery point of HRs 133 and 134 (the relocated claims) lies within the boundaries of HR 74 (an original claim), HRs 133 and 134 can be valid only if HR 74 was abandoned and subsumed by the relocated claim at the time the relocation occurred.
 
 
 20
 Nothing in the statutes, however, precludes an owner from positioning a discovery point for a relocated claim within the boundaries of that owner's original claim. TWS looks instead to Montana case law to support that position. TWS relies heavily on Lehman v. Sutter, 60 Mont. 97, 198 P. 1100 (1921), for the propositions that, when the owner of a claim attempts to relocate his claim, the original claim is abandoned; and that, when the original location is not abandoned and the discovery point for the relocation is within the boundary of the original claim, the relocation is invalid.
 
 
 21
 In Lehman, Henry Nietert located two original claims, the Dixie and Royal, in 1909. In July 1916, Nietert conveyed an undivided nine-tenths interest in them to defendants Julian and Eduard Sutter and C.B. Noble. On September 12, 1916, Nietert conveyed the remaining interest to Claudia Wegner. On September 14, 1916, each of the Sutter claims was relocated by the Sutters and Noble. In April and May of 1917, Oswald Lehman established the locations known as the Royal Dixie and the Dixie Extension on ground covered previously by the Dixie and Royal claims. The court determined that the Sutter relocations were invalid because the Dixie and Royal claims were still occupied by Wegner, who had not joined in the relocation. 198 P. at 1102. The court explained that "[t]he relocation of the Sutter claims, so far as the two Sutters and Noble were concerned, was an abandonment of the Royal and Dixie locations." Id. at 1103. The court then appears to contradict this statement by stating that it was "[b]y reason of the fact that neither they [the defendants] nor Wegner did or caused to be done the annual representation work for the year 1916, the Nietert claims became subject to forfeitures, and thus became subject to relocation by plaintiff." Id. In the end, however, because the court's reference to the abandonment is not necessary to the opinion, the case is not binding.
 
 
 22
 TWS also cites Tiggeman v. Mrzlak, 40 Mont. 19, 105 P. 77 (1909), for the rule that a claim whose discovery point was placed within a pre-existing claim would be void, even though the two claims were owned by the same miner. 105 P. at 80. The district court correctly held, however, that Tiggeman is not dispositive. In that case, the plaintiff claimed rights over competing claims to three locations, including the Walstadde and the Gold Star. The Montana Supreme Court explained that assuming, as the trial court did, the Walstadde claim was located first in order, the Gold Star location was void, "because the discovery made for it was within the boundaries of the Walstadde." Id. at 80. However, the Montana Supreme Court went on to determine that the Gold Star with its discovery monument in the area of the overlap was, in actuality, the senior claim. Thus, the determination that a claim whose discovery point was placed within a pre-existing claim would be void, even though the two claims were owned by the same miner, was ultimately dicta, and not controlling.
 
 
 23
 The district court further found, on the basis of Harvey v. Havener, 135 Mont. 437, 340 P.2d 1084 (1959), that the discovery point of a relocated claim may be placed within an original claim so long as the same claimant holds the overlapping claims. In Harvey, respondents initially had located the Mitch Nos. 23 and 24 mining claims and, subsequently, located the Mitch No. 33 claim overlapping portions of the Mitch Nos. 23 and 24. The discovery monument for the Mitch No. 33 claim was situated within the boundaries of the Mitch Nos. 23 and 24. The appellants claimed an adverse location founded between the time the Mitch Nos. 23 and 24 were located, and the Mitch No. 33 was located. The Montana Supreme Court first held that respondents' failure to record a verified location of a mining claim did not operate to deprive them of their interest as against one who makes a subsequent location with notice of their prior claim. 340 P.2d at 1089. The supreme court then addressed appellant's argument that the Mitch No. 33 claim was void insofar as it traversed the Mitch Nos. 23 and 24 claims. In rejecting that argument, the supreme court held that appellants had overlooked the operation of the now §§ 82-2-108 and 109. Id.
 
 
 24
 TWS contends that the Montana Supreme Court's treatment of the relocation issue cannot be read as a recognition that a claimant may hold both an original and a relocated claim. Rather, TWS suggests that the Harvey court considered the validity of the Mitch Nos. 23 and 24 claims only to show that no rights were lost by a relocation to Mitch No. 33. It is difficult, however, to reconcile TWS's conjecture with Harvey 's clear pronouncement that, pursuant to the operation of the same statutes that are the subject of this case, the senior Mitch claims were not invalidated by the overlapping relocated junior claim. Moreover, as Noranda points out, the respondents in Harvey did not intend to abandon Mitch Nos. 23 and 24, because shortly before the relocation of the Mitch No. 33 claim, they amended the Mitch Nos. 23 and 24 claims in an apparent attempt to preserve those locations. See id. at 1085-86.
 
 
 25
 In sum, nothing in Montana's statutory scheme precludes an owner from positioning a discovery point for a relocated claim within the boundaries of that owner's original claim, and Harvey in fact permits it. Therefore, the Forest Service and the district court correctly interpreted Montana law.
 
 
 26
 II. The Existence of Extralateral Rights on Noranda's Relocated Claims
 
 
 27
 TWS argues that the district court incorrectly concluded that the 1872 Mining Law, 30 U.S.C. § 26, authorizes extralateral rights for Noranda's mining claims. We review the district court's legal determination de novo. Southeast Alaska Conservation Council v. Watson, 697 F.2d 1305, 1309 (9th Cir.1983).[3]
 
 
 28
 While conceding that national forests are generally open to mining claim locations, TWS contends that the General Mining Law and subsequent legislation removed extralateral rights from mineral claims within the national forests. Specifically, TWS asserts that the General Mining Law of 1872 creates two types of land, each with different mineral rights. According to TWS, 30 U.S.C. § 22 provides only a common law right of ownership of minerals found beneath the surface. These rights extend to "lands belonging to the United States, both surveyed and unsurveyed." TWS argues that such common law rights to minerals are distinct from those conferred by 30 U.S.C. § 26, which provides that locators of mines situated on the "public domain" have exclusive possession of (1) surface rights; (2) intraliminal rights, or veins and lodes lying "inside of such surface-lines extended downward vertically"; and (3) extralateral rights, defined as those "extending downward from the apex as to extend outside the vertical sidelines of such surface locations." In addition, TWS urges that Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), supports this distinction.
 
 
 29
 Noranda and the government contend that § 22 and § 26 concern different topics, rather than different lands, and that both are intended to apply to all mining locations. Noranda points out that § 22 is entitled "Lands Open to Purchase by Citizens" and provides simply that mineral deposits and the federal lands in which they are found may be claimed and purchased. Section 26 is entitled "Locators' Rights of Possession and Enjoyment" and provides that, when a party discovers and locates the apex of a lode deposit, the party is entitled to the course of the deposit downwards into the earth. Without such rights to the downward course of the deposit, it could only be appropriated by numerous claims overlying the ore body. Finally, Noranda and the government point out that the first national forest was not even established until approximately 20 years after enactment of the General Mining Law. Thus, they argue, it cannot be concluded that Congress intended to create a different set of rules governing the location of lode deposits in national forests.
 
 
 30
 A plain reading of § 22 and § 26 supports Noranda's and the government's position. Section 22 is a general statute authorizing the exploration and purchase of mineral deposits on lands belonging to the United States, and § 26 states the particulars of a locator's right to possession. Indeed, the language of § 26 assumes that a mineral deposit already has been located within the public domain. Moreover, there is absolutely no support in the legislative history of §§ 22 and 26 for TWS's distinction regarding extralateral rights existing only on lands not withdrawn from the public domain. As Noranda and the government point out, the expression "public domain" has been used very imprecisely by Congress, and has at times included national forest holdings. See 40 U.S.C. § 612(1) (exclusion from the definition of a public building facilities situated "on the public domain (including that reserved for national forests)"); 7 U.S.C. § 426 (authorizing investigations and experiments to control certain species of wildlife "on the national forests and other areas of public domain").
 
 
 31
 Finally, it is disingenuous to suppose that, in view of the importance of extralateral rights to mineral claims, Congress would exclude such rights from national forest mineral development without announcing an underlying policy or reason for the distinction. See, e.g., Last Change Mining Co. v. Bunker Hill & S. Mining & Con. Co., 131 F. 579, 586 (9th Cir.1904) ("The mining right is an integral one, and is precisely the same to all that belongs to the location: its surface, and all veins or lodes apexing within it ... as well as the extralateral right defined by [30 U.S.C. § 26].").
 
 
 32
 TWS's reliance on Cotton Petroleum is misplaced. In that case, the Supreme Court considered whether the State of New Mexico could tax the production of oil and gas from leases on Indian lands acquired by a non-Indian company, Cotton Petroleum Corporation. Cotton Petroleum argued that, in enacting the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a et seq., Congress was interested in guaranteeing Indian tribes the maximum return on their mineral leases, and that New Mexico's taxes unduly interfered with that federal policy. The Supreme Court focused on the legislative history of the Indian Mineral Leasing Act, and concluded that the federal interest was "to remove 'disadvantages in leasing mineral rights on Indian lands that are not present in applying for a claim on the public domain.' " 490 U.S. at 178-79, 109 S.Ct. 1698.
 
 
 33
 TWS argues that because the Supreme Court recognized the distinction between leases on Indian lands and claims located on the public domain, such a distinction also should apply to national forest lands and claims located on the public domain. However, Cotton Petroleum involved neither mining claims located under the General Mining Law nor national forest lands. While the authority to grant leases on Indian lands derives from the Act of June 30, 1919, 25 U.S.C. § 399, which requires that claims "be located ... in the same manner as mining claims are located under the mining laws of the United States," there is no indication (beyond governing the size of load claims) that such claims are governed specifically by the General Mining Law. Accordingly, Cotton Petroleum does not support the distinction between § 22 and § 26 that TWS attempts to make.
 
 
 34
 The Forest Service Organic Act (the "Organic Act"), 16 U.S.C. §§ 475 et seq., is also relevant to whether extralateral claims should be recognized on forest lands. Certain early presidential proclamations establishing the first national forests withdrew the forests from mineral entry. The Organic Act reopened the forest to mineral entry. It provides that lands in the national forests shall be "subject to entry under the existing mining law of the United States and the rules and regulations applying thereto." 16 U.S.C. § 482. Statutorily, the applicability of the laws of the United States is not limited or qualified, which would not limit the application of 30 U.S.C. § 26 (entitling claimants to extralateral rights). See also Pathfinder Mines Corp. v. Hodel, 811 F.2d 1288, 1291 (9th Cir.1987) (national forests are open to location of claims under the General Mining Law). While not controlling, other federal courts have specifically ruled that a claimant with a location in a national forest enjoys extralateral rights pursuant to § 26. See, e.g., United States v. Rizzinelli, 182 F. 675, 679-81 (D.Idaho 1910). BLM regulations are in agreement. See 43 C.F.R. § 3811.1 (1994).
 
 
 35
 Finally, TWS argues that § 4(d)(3) of the Wilderness Act of 1964 supports its contention that extralateral rights do not exist on national forests. Section 4(d)(3) provides that patents in wilderness areas shall convey title "to the mineral deposits within the claim." TWS argues that "within the claim" excludes extralateral rights. TWS, however, presents no direct authority for that interpretation. On the other hand, as the government points out, the Forest Service has rejected it. See A.R. Doc 725 at 4.
 
 
 36
 In conclusion, TWS has failed to demonstrate that the district court erred in concluding that it was reasonable for the Forest Service to determine that "extralateral rights" apply in national forests. Therefore, we will not disturb the decision below on that ground.III. The "Valid Existing Rights" Determination
 
 
 37
 TWS argues that the district court erred in upholding the Forest Service's determination that Noranda had discovered a valuable mineral deposit on claims HR 133 and 134 before the wilderness area withdrawal date. An agency decision is not reversible unless it is shown to be arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706 (1976). Although we review the entire record to determine whether substantial evidence supports an agency's decision, we defer to the agency's expertise in determining what constitutes a discovery. See Lara v. Secretary of Interior, 820 F.2d 1535, 1542 (9th Cir.1987).
 
 
 38
 The Wilderness Act of 1964, 16 U.S.C. §§ 1131 et seq., allowed mineral exploration in designated wilderness areas to continue for twenty years after passage of the Act. Section 1133(d)(3). Subject to valid rights then existing, the minerals in the lands designated as wilderness areas were withdrawn after the expiration of the twenty years. Id. Thus, in order for mining to continue beyond the expiration of the twenty-year period, a claim must have contained a discovery of a valuable mineral deposit that would survive the closure of the wilderness areas to mineral exploration.
 
 
 39
 In order to show discovery of a valuable mineral deposit, a mineral claimant must (1) find a mineral resource by physically exposing a vein or lode, and (2) obtain evidence of the quality and quantity of the mineral that would convince a prudent person that development of a mine is justified. Chrisman v. Miller, 197 U.S. 313, 322, 25 S.Ct. 468, 49 L.Ed. 770 (1905); Converse v. Udall, 399 F.2d 616, 619 (9th Cir.1968). "A discovery must be judged by what has been exposed on a mining claim at the time of a withdrawal." United States v. Parker, 82 IBLA 344, 384 (1984); Rawls v. United States, 566 F.2d 1373, 1376 (9th Cir.1978). That determination may be based on what is known as geologic inference. Geologic information is used to determine the reasonable likelihood of the persistence of similar mineralization beyond the areas actually sampled or exposed. United States v. Feezor, 74 IBLA 56, 80 (1983).
 
 
 40
 TWS maintains that the district court should have overturned the Forest Service's determination that Noranda held valid existing rights, because (1) the determination was improperly based on post-withdrawal information, and (2) geologic inference did not support the determination. TWS identifies Noranda's pre-withdrawal data as consisting of surface samples from the outcrop near Rock Lake; surface samples from exposed mineral at historic mine workings along the Rock Lake fault to the northwest; two nearby drill holes (HRs 2 and 3) that intercepted ore-grade mineralization; and, two drill holes (HRs 1 and 4) that did not intercept ore. TWS, however, maintains that the Forest Service improperly relied on samples from drill holes HR 2 and 3, which were deepened after withdrawal, and drill holes HR 5 and 6, which were drilled after the withdrawal date to calculate reserves. The district court wrote that TWS charged the Forest Service with having relied on post-withdrawal surface samplings taken from an old mine at 5,600 feet to arrive at the assumption that the mineral deposit continued for 5,600 feet past the outcrop.
 
 
 41
 The district court found that, on the basis of pre-withdrawal data in isolation, the Forest Service was able to conclude that there existed on the date of withdrawal a valuable copper-silver deposit that could have been mined, removed, and marketed at a profit. The parties agree that, once a discovery has been established using pre-withdrawal data, post-withdrawal information may be used to confirm, corroborate, and show additional value beyond that needed to establish a pre-withdrawal discovery. Here, the district court held that "the minimum requirement at the withdrawal date is the disclosure of mineral." (Citing United States v. Foresyth, 100 IBLA 185, 207 (1987).)
 
 
 42
 TWS argues that more than the mere exposure of some mineral is needed; specifically, evidence adequate to establish a valuable mineral deposit. See United States v. Jones, 72 IBLA 52, 56 (1983). According to TWS, since the Forest Service made the calculation of mineral reserves to establish a discovery using pre-- and post-withdrawal data, it is impossible, in the absence of a separate pre-withdrawal discovery analysis, to conclude that pre-withdrawal data alone supported a discovery.
 
 
 43
 On the contrary, as the administrative record points out, the pre-withdrawal sampling data allowed the Forest Service to establish the following about the Montanore mineral deposit:
 
 
 44
 a. a deposit width along its strike of approximately 700 feet;
 
 
 45
 b. a deposit thickness of approximately 200 feet;
 
 
 46
 c. a downward dip of the vein to the northwest of between 12 and 17 degrees;
 
 
 47
 d. a high average grade or ore; and
 
 
 48
 e. a predominantly tubular, continuous lode elongated in the northwest-southeast fashion.
 
 
 49
 On the basis of this information, plus extensive mapping of the surface geology, information on deposits in proximity to the Montanore, and scientific literature concerning the geology of the area, the Forest Service had sufficient pre-withdrawal information to infer that the Montanore Deposit extended beyond the claims approximately 5,600 feet toward the northwest to St. Paul Pass.
 
 
 50
 TWS further challenges the Forest Service's use of "geologic inference" in determining the extent and direction of the deposit. As the district court determined, the Forest Service was aware of the requirement that there be structural evidence to support the "inference of [an] ore body of sufficient quantity to justify a prudent man in expending labor and means with a reasonable prospect of success in developing a paying mine." United States v. Dresselhaus, 81 IBLA 242, 268 (1984). The district court identified five specific pieces of geologic evidence or characteristics supporting the Forest Service's use of geologic inference:
 
 
 51
 (1) The Montanore Deposit shares many characteristics common to other Revett-hosted copper-silver deposits in the area;
 
 
 52
 (2) Mineralization exposed and tested prior to the withdrawal date was continuous over a significant distance, and exhibited a substantial stratigraphic thickness, and contained a high grade mineralization;
 
 
 53
 (3) Pre-withdrawal exploration showed that the deposit was continuously mineralized for 300 feet along its underground dip to the northwest;
 
 
 54
 (4) Surface samples containing copper-silver mineralization were taken along the Rock Lake fault at 2,800 feet, 5,600 feet, 5,800 feet, and 7,200 feet northwest of the exposed outcrop adjacent to Rock Lake; and
 
 
 55
 (5) Pre-withdrawal sampling and drilling showed mineralization in the bornite-chalcocite zone, and experience with virtually all other Revett-hosted stratabound deposits in the region showed that additional zones of chalcopyrite, galena, sphalerite, and pyrite would have to be traversed before reaching the end of the deposit--a significant distance to the northwest.
 
 
 56
 Finally, TWS asserts that surface samplings cannot alone be used to support inference of subsurface deposits. See Feezor, 74 IBLA at 79-81. The record in this case, however, clearly indicates that the subsurface inferences were based on more information than solely surface sampling. The Forest Service studied pre-withdrawal surface samples and four drill holes. That two of the drill holes, HRs 1 and 4, drilled at approximately 15,500 and 22,000 feet to the northwest of the outcrop, did not reveal ore-grade mineralization does not make them insignificant. For example, HR 1 revealed "signature" mineralization (calcocite and bornite) that was associated with minable ore. The Forest Service also considered geologic evidence gained from the Troy mine and Rock Creek area, other operations in the Revett Formation, to determine that mineralization frequently thickened and increased in grade toward the NW-striking faults. Finally, on the basis of the geologic information and scientific literature, the Forest Service conservatively projected its inference to 5,600 feet from the outcrop, far less than Borax claimed the inference could extend. In sum, we find substantial evidence supporting the Forest Service's factual determinations.
 
 
 57
 IV. Exclusion of Declarations of Dr. W. Thomas Goerold
 
 
 58
 The district court found that the declarations of Dr. W. Thomas Goerold should not have been used to supplement the administrative record. Review of agency action is limited to the record considered and relied upon by the agency at the time a decision is made. National Wildlife Fed'n v. Burford, 871 F.2d 849, 855 (9th Cir.1989). TWS, however, contends that the Goerold declarations are necessary to explain "the significance of the geologic information in the record and identify crucial gaps in this record." Because the Goerold declarations were not submitted during the Forest Service's administrative appeals process, the district court did not abuse its discretion in refusing to make them a part of the record here.
 
 
 59
 AFFIRMED.
 
 
 
 *
 The Honorable Lloyd D. George, United States District Judge, District of Nevada, sitting by designation
 
 
 [1]
 Montana law also contains a process for locators to amend their locations and make changes in the boundaries if such changes do not involve changing the point of discovery. See Mont.Code Ann. § 82-2-107 (a locator may change boundaries if there is no change in the point of discovery). The parties agree, however, that Borax's modification involves a relocation of claims
 
 
 [2]
 Noranda's and the government's argument that this provision allows both the original and relocated claims to exist simultaneously reaches too far. The provision relates only to the status of the common or overlapping areas
 
 
 [3]
 A reviewing court should accord great weight to agency interpretations of federal statutes. Southeast Alaska, 697 F.2d at 1309 n. 1. However, an agency's determination is not necessarily controlling, since the court is the final authority on important questions of statutory construction. Id